278 N.W.2d 189 (1979)
APPLICATION OF MONTANA-DAKOTA UTILITIES COMPANY FOR AUTHORITY TO ESTABLISH INCREASED RATES FOR ELECTRIC SERVICE (F-3126).
No. 12490.
Supreme Court of South Dakota.
Argued February 22, 1979.
Decided April 26, 1979.
*190 Alan J. Roth, of Spiegel & McDiarmid, Washington, D. C., for appellant South Dakota Public Utilities Commission; Ben Stead, Asst. Atty. Gen., Pierre, on the brief.
Warren W. May, of May, Adam, Gerdes & Thompson, Pierre, Joseph R. Maichel, Bismarck, N. D., for respondent Montana-Dakota Utilities Co.
DUNN, Justice.
This is an appeal from the judgment of the Circuit Court, Sixth Judicial Circuit, which reversed the decision and order of the South Dakota Public Utilities Commission (Commission). As part of its determination of increased rates for electric service, the Commission decision and order reduced the revenue requirements of Montana-Dakota Utilities Company (MDU) by $128,500, which represented alleged unreasonable profits on the sale of coal to MDU by its wholly-owned subsidiary, Knife River Coal Company (Knife River). The Commission appeals from the circuit court reversal. We reverse the circuit court's judgment and remand with instructions.
On July 26, 1976, MDU filed an application with the Commission to increase retail electric rates charged to its South Dakota customers. Commencing on January 17, 1977, the Commission held a three-day hearing on the matter. Subsequent to the filing of briefs regarding the numerous issues raised in the matter, the Commission rendered its decision and order on April 22, 1977. MDU appealed from the Commission's decision and order as to three of the eight issues decided. On September 15, 1977, the circuit court held a hearing on the appeal. The circuit court entered its memorandum decision on January 27, 1978, and rendered judgment on March 13, 1978. The circuit court reversed the Commission's action which reduced MDU's revenue requirements by $128,500 representing alleged unreasonable profits from the sale of coal by Knife River to MDU. The Commission has appealed from this portion of the circuit court judgment, and the sole matter for our consideration is the issue of reasonable profits.
Appeals from the Commission's decisions and orders are governed by the South Dakota Administrative Procedures Act embodied in SDCL 1-26. SDCL 49-34A-62. We have jurisdiction to review the judgment of the circuit court pursuant to SDCL 1-26-37. The parties have raised the question of the standard of review that we are to use in this appeal. The circuit court reviewed the Commission's decision pursuant to SDCL 1-26-36(5) which, at the time of the circuit court's review, authorized the circuit court to reverse the Commission if substantial rights were prejudiced because the decision was unsupported by substantial evidence on the record. After the circuit court's review and prior to our review, the standard of review in SDCL 1-26-36(5) was changed to "clearly erroneous in light of the entire evidence in the record." In selecting the appropriate standard of review, we adhere to our statement in Piper v. Neighborhood Youth Corps, 1976, S.D., 241 N.W.2d 868, 869, as follows:
"* * * in reviewing the circuit court's judgment under the APA this court must make the same review of the administrative tribunal's action as does the circuit court under SDCL 1-26-37."
Therefore, we will utilize the substantial evidence standard of review in this appeal. We recognize that the standard to be applied is not whether there is substantial evidence contrary to the Commission's findings, but, rather, whether there is substantial evidence to support the Commission's findings. State, Dept. of Soc. Serv. v. Rodvik, 1978, S.D., 264 N.W.2d 898; Application of Ed Phillips & Sons Company, 1972, 86 S.D. 326, 195 N.W.2d 400. Substantial evidence is defined as "such relevant and competent evidence as a reasonable mind might accept as being sufficiently adequate to support a conclusion." SDCL 1-26-1(8). We further recognize that we must make our decision as to whether the Commission's decision and order can be sustained without the aid of the presumption that the circuit court's decision and judgment are correct. Piper v. Neighborhood Youth Corps, supra.
*191 The issue before us is whether the Commission's findings, inferences, conclusions, and decision are supported by substantial evidence on the record.
In its application for increased rates for retail electric service, MDU included the cost of coal as a part of its revenue requirements. MDU purchases all of the coal it uses to generate the electricity it sells from its wholly-owned subsidiary, Knife River. MDU purchases of coal constitute 33% of Knife River's total tonnage with the remaining 67% being sold to other purchasers. Although the coal industry is not a regulated utility subject to control by the Commission, the Commission has statutory authority pursuant to SDCL 49-34A-19.2 to analyze the reasonableness of profits paid to supplier subsidiaries in its determination of the revenue requirements allowable to a regulated utility and to disallow such profit which is unreasonable. SDCL 49-34A-19.2 reads as follows:
"The commission, in determining the allowance for materials or services to be included in costs of operations for rate-making purposes, may disallow any unreasonable profit made in the sale of materials to or service supplied for any public utility by any firm or corporation owned or controlled directly or indirectly by such utility or any affiliate, subsidiary, parent company, associate or any corporation whose controlling stockholders are also controlling stockholders of such utility. The burden of proof shall be on the public utility to prove that no unreasonable profit is involved."
This embodies the concept to which we have adhered for decades, that is, prices and profits paid to affiliates and subsidiaries must be reasonable. In Re Northwestern Bell Telephone Co., 1950, 73 S.D. 370, 43 N.W.2d 553. In determining reasonableness, the Commission is not restricted to any single formula in arriving at the rates fixed for MDU "so long as the method followed and the order entered when applied to the facts and viewed as a whole do not produce an unjust or arbitrary result." N. W. Pub. Serv. v. Cities of Chamberlain, etc., 1978, S.D., 265 N.W.2d 867, 872. We are more concerned with the result which is reached than with the method employed. Application of Northwestern Bell Telephone Co., 1959, 78 S.D. 15, 98 N.W.2d 170.
As quoted above, SDCL 49-34A-19.2 places the burden on MDU to prove that no unreasonable profits are involved in Knife River coal sales to MDU. MDU attempted to meet this burden by establishing that it paid no more for the coal purchased from Knife River than other purchasers and that, in fact, MDU paid less for coal from Knife River than other purchasers. The price that MDU paid Knife River was determined in two ways. First, MDU would not pay more for its coal than other Knife River customers paid for their purchases from Knife River and, second, MDU would monitor the prices of other coal producers and purchase coal from those producers if their prices were lower than Knife River's prices. MDU contended that these "independent yardsticks" kept the prices it paid for coal very competitive and reasonable. MDU further contended that the profits Knife River derived from those prices were also reasonable when measured against the fair market value of Knife River coal reserves and operating equipment, i. e., approximately 3%. MDU offered expert testimony stating that the return earned on the fair market value of a competitive company's assets is a governing principle in economics for competitive enterprises, especially to companies involved in the extraction and sale of exhaustible capital assets such as coal. MDU contends that reasonable profits for Knife River must be defined in the context of an unregulated natural resource company operating in the free market, rather than a regulated utility.
The Commission concluded that MDU did not meet its burden of proving the reasonableness of Knife River profits primarily because of the lack of a truly competitive market. The Commission heard expert testimony relating to the monopolistic forces and vertical integration evident in the coal industry and the market inter-relationships with the oil industry. The Commission *192 adopted the viewpoint that the fact that MDU pays market prices to Knife River does not prove that the prices or the profits derived from those prices are reasonable. As to the MDU contention that it pays less for coal from Knife River than other purchasers, the record indicates that MDU paid "a slightly lower average charge" which is attributable to higher prices for sales of certain special quality coal and for low volume sales to other customers. The evidence is clear that MDU pays the same basic price for like quantities and qualities of coal as do other Knife River coal purchasers. The record further indicates that Knife River develops its coal reserves much more slowly than other coal companies would. Purportedly, the reason for such slow development is to assure a continuing supply for MDU generating stations. The Commission questioned such slow development and stated the possibility that Knife River's coal prices could be lower than they are currently if the reserves were put into the marketplace at a faster pace. The determinations that MDU uses to decide the price it is willing to pay for coal as discussed above tend to remove MDU, a major buyer, as a price-bargaining force in the local coal market. This, coupled with the testimony that Knife River has come to dominate the local coal market, has the result of dampening the competitive market price effects. The result is compounded by the fact that Knife River faces a "wall" about fifty miles outside the perimeter of North Dakota beyond which it has insurmountable difficulty in selling coal due in part to the relatively low BTU content and water content of its lignite coal and that all of MDU's coal-fired generating stations are within that market perimeter. Further evidence that Knife River is not being run entirely as an independent coal company is that its manager testified that the primary obligation of Knife River is to supply MDU with coal. The Commission noted that the parent-subsidiary status of MDU and Knife River had an inherently negative effect on competition and questioned the existence of arms-length negotiations for reasonable prices in this restricted market. The Commission concluded that Knife River's prices might well be lower if the coal company were truly independent from MDU and therefore that the coal market price did not assure the reasonableness of Knife River's prices or profits.
Although there is substantial evidence on the record to support the conclusion that true competitive market conditions did not exist between MDU and Knife River and that the prices and profits derived therefrom paid to Knife River as a part of the revenue requirements in the MDU application are unreasonable, we do not find substantial evidence to support the reasoning and conclusion reached by the Commission that the rate of return allowed for MDU of 11.5% of equity is a reasonable figure for Knife River. The Commission concluded that MDU had not met its burden to prove that no unreasonable profits were involved. The Commission then used a cost approach rather than MDU's suggested fair market value approach to analyze Knife River profits. Based upon the net worth of the assets, the Commission computed a 37.45% rate of return for Knife River during the 1976 test year. This was compared to an exhibit offered by the Commission staff which showed average rates of return on net worth from 1966 to a projected 1976 for five independent coal companies. For the sample of five companies, rates of return on net worth ranged between 6% and 12% for the years 1966-1972, 13.6% for the year 1973, and then rose to peak levels during the OPEC oil embargo of 32% for the years 1974-1975, but fell off to an estimated 24.5% for the year 1976. This projected 1976 figure was well below the computed rate of return for Knife River of 37.45% for its sales of coal to MDU in 1976. The Commission indicated that the five-company sample was indicative of the coal industry and that a larger sample was not readily available because many smaller companies do not report and the rest of the industry is either substantially diversified or owned principally by major oil and gas companies or electric utilities or by small companies whose stock is not widely traded.
*193 The Commission then concluded that the rate of return earned by Knife River was too high and unreasonable as compared to the market averages derived from the sample coal companies, and it restricted Knife River to a rate of return well below the coal market average and equal to the rate of return allowed MDU. The Commission rationalized the below-market rate of return on the basis that the assured market that MDU provides to Knife River lessens the risk to Knife River and therefore warrants a lesser rate of return than independent coal companies should earn, that the recent high rates of return are unsettling and declining, i. e., the high prices in 1974-75 were attributable to the noncompetitive impact of the OPEC cartel, and that Knife River is affiliated with its principal buyer and therefore is not an independent coal company like those in the five-company sample. The Commission further rationalizes its restriction to a below-market rate of return equal to that allowed for MDU by stating that in a previous MDU rate case before it, the Commission decided against a disallowance of any profits MDU paid to Knife River, but held that it would closely scrutinize the profits in future proceedings and that MDU would carry the responsibility to justify any higher rate of return for Knife River than the return allowed to MDU itself. At the same time, the Commission recognized that comparing MDU and Knife River rates of return "may not necessarily be proper." Commission decision dated August 6, 1976, PUC Doc. No. F-3053, p. 13. In effect, the Commission announced a presumption of sorts that Knife River would be held to the same rate of return as that allowed to MDU if MDU could not justify a higher rate of return. Such an approach appears to be contrary to our statute quoted above. The burden was on MDU to prove that "no unreasonable profit is involved." SDCL 49-34A-19.2. According to the Commission, however, MDU did not meet its burden of proof. The evidence indicates that there were indeed unreasonable profits in light of the five-company average in the sample and on the basis of the cost approach, but this indication of unreasonable profits does not justify the Commission's action in arbitrarily setting the Knife River rate of return at the same level as that allowed to MDU. Our statute only authorizes the Commission to disallow unreasonable profit made in the sale of coal by Knife River to MDU. The computed rate of return of 37.45% was shown to be unreasonable and the five-company average rate of return was submitted into evidence by the Commission which implied a standard by which reasonableness could be ascertained.
While the rate of return on wholly-owned coal companies is subject to close scrutiny under SDCL 49-34A-19.2, it does not follow that the coal companies should be held to the same rate of return as a public utility. First, they are not subject to the authority of the Commission. Secondly, the rate of return to coal companies, because of the depletion factor, cannot be considered on the same basis as a utility which buys its raw materials on the competitive market and sells its electricity to the consumer based upon a rate fixed by the various costs of doing business. It is doubtful if the Commission staff even claims the expertise to set coal prices as it does utility rates, and therefore it must rely on the reasonable competitive market for coal established by the industry in setting coal companies' rates of return. We must conclude, therefore, that there is no substantial evidence to support the conclusion of the Commission that 11.5% is a reasonable rate of return for Knife River in light of the clear showing of what was a reasonable rate of return for other independent coal companies.
Accordingly, we affirm the Commission's decision and order which found unreasonable profits and reverse the Commission's decision in setting Knife River's rate of return at the same level allowed to MDU. Inasmuch as the circuit court reversed the Commission decision and order and found no unreasonable profits, we must reverse the judgment of the circuit court and remand the case to the circuit court for remand to the Commission with instructions *194 to set a rate of return for Knife River which comports with a reasonable rate of return in light of the five-company sample and in accordance with this decision.
The judgment of the circuit court is reversed and the case is remanded to the circuit court for remand to the Commission with instructions.
MORGAN, HENDERSON and FOSHEIM, JJ., concur.
WOLLMAN, C. J., dissents.
WOLLMAN, Chief Justice (dissenting).
I would affirm the judgment of the circuit court.
As the majority opinion points out, MDU's purchases constitute only thirty-three percent of Knife River's total annual tonnage, the remaining sixty-seven percent being sold to other purchasers, which in 1976 included Otter Tail Power Company, Fergus Falls, Minnesota; Public Service Department, Moorhead, Minnesota; American Crystal Sugar Company, Moorhead and Renville, Minnesota; Fergus Falls State Hospital, Fergus Falls, Minnesota; American Colloid Company, Gascoyne, North Dakota; Dresser Minerals, Gascoyne, North Dakota; Nalco Chemical Company, Gascoyne, North Dakota; and Big Stone Plant, Big Stone City, South Dakota. The uncontradicted testimony establishes that the contracts with these other purchasers were entered into on the basis of arm's length negotiations. Indeed, several of these purchasers were represented by counsel from major law firms in Minneapolis and Chicago.
There is substantial evidence in the record to the effect that it is not realistic to use the historic cost approach in determining the return on equity for companies engaged in coal mining. Even aside from that, however, the exhibits upon which the Commission relied to compare Knife River's profits with that of five independent coal companies was prepared by a witness whose opinion it was that profits in the coal mining industry are presently excessive. Moreover, the evidence regarding the average rates of return on net worth for the five independent coal companies is not sufficiently detailed to warrant the conclusion that those rates represent the upper limits for a reasonable rate of return for Knife River. If Knife River's prices are competitive, and I am satisfied that the record establishes that they are, then, as the majority opinion states, the Commission must rely on those competitive prices in determining the reasonableness of Knife River's profits.