SOUTH DAKOTA PUBLIC UTILITIES
COMMISSION, Appellant,
v.
OTTER TAIL POWER COMPANY,
Respondent.

No. 12562.

Supreme Court of South Dakota.

Argued Oct. 11, 1979.

Decided April 16, 1980.

Rehearing Denied May 22, 1980.

Frances E. Francis, Spiegel & McDiarmid, Washington, D.C., Ben Stead, Asst. Atty. Gen., Pierre, for appellant; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

Warren W. May of May, Adam, Gerdes & Thompson, Pierre, Peter A. Hoff of Arvesen, Donoho, Lundef, Hoff & Svingen, Fergus Falls, Minn., for respondent.

FOSHEIM, Justice.

This appeal stems from a rate increase applicable to the South Dakota retail electric customers of Otter Tail Power Company (OTP). We affirm in part and reverse in part and remand.

OTP is an investor-owned electric utility, providing electric service at retail in Minnesota, North Dakota and South Dakota. In 1975, OTP had a revenue deficiency and filed for a rate increase, requesting that its South Dakota customers share in correcting the loss. Its request was denied by the Public Utilities Commission (PUC), and OTP appealed. In February of 1977, the circuit court found that the findings of the PUC were deficient and remanded for further proceedings. The PUC issued a new decision in July of 1977 which purported to satisfy the remand directions. OTP again appealed from the PUC decision and the circuit court overruled the PUC. The PUC now appeals from the ensuing order of the circuit court.

From the issues before the PUC and the circuit court, five remain: (1) Transmission Plant Allocation; (2) Compensating Bank Balances; (3) Construction Work in Progress; (4) Inflation Adjustments; and (5) Power Pool Sales. We reverse as to (1), (3) and (5), and affirm as to (2) and (4).

SDCL 49–34A–62 places appeals from the PUC under the provisions of SDCL 1–26. SDCL 1–26–36[1] controls the scope of review and, at the time this case was decided, provided that the court shall not substitute its judgment for that of the administrative agency regarding the weight of the evidence on questions of fact. It allowed, however, reversal or modification of the decision of the agency if it is unsupported by substantial evidence on the whole record or is an arbitrary exercise of discretion. *Matter of Certain Territorial Electric Boundaries*, 281 N.W.2d 65 (S.D.1979); *Dail v. South Dakota Real Estate Commission*, 257 N.W.2d 709 (S.D.1977).

On appeal, this court must make the same review of the administrative tribunal's action as did the circuit court. Our determination as to whether the administrative decision can be sustained is unaided by a presumption that the circuit court's decision is correct. *Application of Montana Dakota Utilities Co.*, 278 N.W.2d 189 (S.D.1979);

1. SDCL 1–26–36 read, at the times in question, as follows:

The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Unsupported by substantial evidence on the whole record; or
(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Piper v. Neighborhood Youth Corps*, 241 N.W.2d 868 (S.D.1976).

■ Accordingly, we must apply the "substantial evidence" standard even though that part of SDCL 1–26–36 has in the meantime been amended.[2] *Matter of Certain Territorial Electric Boundaries*, supra. The standard of review is not whether there is substantial evidence contrary to the court's finding, but whether there is substantial evidence to support the agency's finding. *Application of Ed Phillips and Sons, Co.*, 86 S.D. 326, 195 N.W.2d 400 (1972). "Substantial evidence" means such relevant and competent evidence as a reasonable mind might accept as being sufficiently adequate to support a conclusion. SDCL 1–26–1(8).

This court has consistently recognized that rate making is a legislative process, whether performed directly by the legislature, or by an agency of its creation. *Northwestern Public Service v. Cities of Chamberlain, etc.*, 265 N.W.2d 867 (S.D. 1978) *(NPS v. Chamberlain)*. This extends to the procedure by which a legislative determination is made and, within the broad field where that discretion is operative, legislative determinations are conclusive. *NPS v. Chamberlain*, supra; *Application of Northwestern Bell Telephone Co.*, 78 S.D. 15, 98 N.W.2d 170 (1959); *In re Northwestern Bell Telephone Company*, 73 S.D. 370, 43 N.W.2d 553 (1950); *Application of Dakota Transportation, Inc., of Sioux Falls*, 67 S.D. 221, 291 N.W. 589 (1940).

In *NPS v. Chamberlain*, supra, we quoted approvingly from this expression of the United States Supreme Court in *Permian Basin Area Rate Cases*, 390 U.S. 747, 791–2, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312, 350 (1968):

It follows that the responsibilities of a reviewing court are essentially three. First, it must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors.

With these criteria in mind, we turn to the points at issue.

(1) *Transmission Plant Allocation*

OTP operates an integrated electric system in the states of Minnesota, North Dakota and South Dakota providing electric service facilities for generation, transmission, and distribution. These three functions are the basis upon which costs are determined for the entire system. The generation and transmission functions are referred to as the bulk power supply function, and their purpose is to generate and deliver power to the local areas where the electricity is then stepped down to lower voltages that are useable by, and distributed to, the ultimate consumer. OTP has 672 miles of electrical lines in South Dakota.

In this proceeding, the issue was the allocation of OTP's transmission costs. OTP

---

2. 1978 SDCL Sess.Laws, Ch. 17, amended SDCL 1–26–36 to read:

The court shall give great weight to the findings made and inferences drawn by an agency on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(5) Clearly erroneous in light of the entire evidence in the record.

generation costs for the system were determined and allocated on the basis of relative demand among the three sets of customers in each state.

In order to apportion rate base and expense among the three states it serves, OTP developed allocation percentages. OTP used mileage and demand as allocation factors in obtaining the percentage of the transmission plant being used in South Dakota. The percentage of the total demand on the entire system allocable to South Dakota customers and the percentage of the miles of line in this state were determined. These factors were then weighted with 40% to demand and 60% to miles of line. This resulted in about 10.3% of the total OTP transmission plant investment being allocated to South Dakota. Mr. Towers, a public utility rate consultant and PUC witness, reviewed OTP diagrams. He considered all KV (kilovolt) facilities above a certain point of KV demarcation to represent its investment in transmission facilities performing the bulk power supply function. Lower KV facilities were considered essentially local in function. In averaging the demand and line mileage factors, he gave 90.4% weight to demand and 9.6% weight to mileage. Mr. Towers calculated that approximately 8.5% of OTP transmission investment is allocable to South Dakota. The PUC adopted the 8.5% allocation, but it was rejected by the circuit court in favor of the OTP 10.3%.

As we indicated in *NPS v. Chamberlain*, the PUC need not follow any single formula in arriving at the rates fixed so long as the method used, when applied to the facts and viewed as a whole, does not produce an arbitrary result. Since the determination reached by the PUC rested on substantial evidence, we cannot conclude it was arbitrary and capricious. Accordingly, that part of the circuit court order directing that the higher allocation be included in the rate base is reversed.

### (2) *Compensating Bank Balances*

The circuit court vacated the PUC's decision disallowing $246,427.00 in compensating bank balances sought by OTP on the grounds that OTP failed to meet the following three-part test: (1) The utility must show that the balances are contractually required; (2) that the balances represent the least costly method of obtaining lines of short-term credit; and (3) that the utility does, in fact, maintain these balances.

In *NPS v. Chamberlain*, supra, we indicated that the amount and necessity of compensating bank balances must be supported by the testimony of company and bank officials, and we quoted from the New York Public Service Commission in *Niagara-Mohawk Power Corporation*, 87 PUR3d 189 (N.Y.1970): "[W]e would want, for example, testimony of bank officers that such balances are required to be maintained . . . Evidence also should be submitted concerning the use which is made of the funds borrowed which result in these balances."

In this case, no bank officials who extended credit to OTP testified. We further indicated in *NPS v. Chamberlain*, however, that proof of the necessity of compensating balances need not rise to the level of being clear and convincing.

OTP introduced into evidence several letters from banks, most of which indicated expressly or by implication that the line of credit extended to OTP was conditioned upon the maintenance of compensating bank balances. Also entered into evidence was a copy of the prospectus covering the sale of 250,000 shares of common stock of OTP, dated May 4, 1976. This prospectus contained financial statements of OTP for the five years ending December 31, 1975, which were audited by an independent certified public accountant whose note to these statements reads, in part:

> The Company maintains compensating balances at various banks in support of formal lines of credit. The balance either represents 10% of the line of credit or 10% of the line of credit plus 10% of the outstanding balance. At December 31, 1975 these lines totaled $27 million and made available to the Company bank loans for short-term financing . . .

The 1975 OTP annual report contained essentially the same statement. OTP officers testified that the utility did maintain compensating bank balances and that the company could not otherwise obtain lines of credit. Mr. Hartl, an OTP officer with many years' experience in obtaining such credit, testified that he actively sought the optimum financing arrangements available, and these turned out to be compensating balance arrangements.

While the bank letters were not, of course, formal contracts, the PUC test quite logically did not require production of a refined legal instrument. Obviously, the PUC, in adopting its test, was concerned only with whether there was evidence to support a finding that the compensating balances were required by the lending institutions. In *NPS v. Chamberlain*, we held that the company there had not met its burden of proof. The only evidence was "a casual reference" during rebuttal testimony to the effect that the average cash balance on deposit totaled $898,121.00, and even that was not supported by *any* testimony of bank or company officials.

We believe the evidentiary standard employed in *NPS v. Chamberlain* should be applied to all aspects of the PUC test concerning compensating bank balances. With this in mind, it suffices to note that the testimony of the OTP officers, combined with the bank letters and official financial statements of the company, adequately supports the conclusion that compensating bank balances were necessary, were actually maintained, and were the least costly line of available credit. We conclude, therefore, that the circuit court was correct in finding that OTP had satisfied its burden of proof and that the action of the PUC with regard to that item of rate base was arbitrary and capricious.

(3) *Construction Work in Progress*

A utility generally is not allowed to earn a return on construction until it is actually placed in service. *Application of Northwestern Bell Telephone Co.*, supra. OTP asked for $260,689.00 of short-term

construction work in progress (CWIP) funds in South Dakota on small construction projects. The PUC adopted its staff's recommendations that the CWIP should have been capitalized as an allowance for funds used during construction (AFUDC). OTP elected to include these amounts in rate base. Appellant contends that the capitalization of AFUDC and the alternate procedure of permitting plant investments to be included in rate base, while the plant is under construction, are equivalent methods of compensating the utility and its investor for the capital costs incurred by the utility during the construction period, but that the two procedures are not equivalent methods of cost recovery insofar as the customers are concerned.

Appellant further argues that the capitalization of AFUDC is the only method which is consistent with the regulatory principle followed by the PUC of matching the costs reflected in utility rates with the service benefits concurrently received by ratepayers, and that including CWIP in rate base compels current customers to pay for plant construction which will render service in the future.

Under the appellants' Uniform System of Accounts, OTP can unilaterally capitalize AFUDC on the construction work in progress. It would then be reimbursed fully by its customers for the costs of plant, including funds booked as AFUDC. We do not agree with the trial court that the refusal of the PUC to include these amounts in rate base was arbitrary or capricious or an unwarranted exercise of discretion.

(4) *Inflation Adjustments*

The PUC refused to accept OTP's proposed adjustment to its operating costs for inflation. The method used by OTP to allow for inflation was to take the Consumer Price Index and the Wholesale Price Index at the beginning and again at the end of the test year to determine the increase. It then took one-half of the increase and applied it to operating costs other than fuel, labor and postage. Appellant argues that the method used by OTP did not support the raising of its operating

costs for rate purposes across the board, because of general trends in the economy and because it would be sheer coincidence if OTP's expenses coincide with its formula. PUC further argues that OTP's employees, in preparing their forecast for the budget that constitutes the basis for the rate increase, likely took into account the effects of inflation in making estimates, and that, therefore, this would constitute double-counting and additional inflation. OTP counters that since the PUC rejected its proposed test year and adopted as test year figures the actual figures for 1975, there could be no double-counting.

The PUC found that OTP's proposed inflation adjustment was not based upon measurable change and, therefore, it was disallowed. The circuit court found that the disallowance of the proposed adjustments for the purpose of inflation, in regard to OTP's operating costs, was an arbitrary, capricious and wholly unwarranted exercise of discretion.

While it is not clear that OTP would experience an inflation rate comparable to fluctuations in the Wholesale Price Index, or the Consumer Price Index, we agree with the trial court that to disallow any inflation adjustment is unrealistic and unwarranted. Proving an adjustment for inflation as to operating costs is at best elusive, complicated and fraught with uncertainty.

The PUC acknowledges that OTP will sustain increased operating costs due to inflation. We agree with the trial court that in the absence of any guidelines set forth by the PUC for the development of an inflation adjustment by investor-owned utilities, or to adopt an inflation adjustment on its own, it appears that a failure to recognize these increased costs, as presented by OTP, was an arbitrary decision. There are likely more accurate methods of proof; the trial court was correct in vacating the disallowance and remanding the issue to the PUC to determine a reasonable inflation adjustment procedure and allowance.

(5) *Pool Sale Rate Increase*

■ The circuit court held that the adjustment adopted by the PUC, designed to reflect the Upper Mississippi Valley Power Pool (UMVPP) agreement rates that became effective November 1, 1975, to OTP's sales to other systems, was arbitrary, capricious and not supported by substantial evidence on the record. The PUC increased OTP's revenues by $81,548.00 before taxes, because the increased UMVPP rate was a known and measurable change that would occur in the test period. The PUC recognized that the increased UMVPP rate was attributable in part to the higher costs of the Big Stone Plant and that a failure to relate the increased UMVPP rate to the sales being made by OTP from Big Stone would result in a mismatch of expenses and revenues. The PUC held, however, that it would be improper to recognize the increased costs associated with the Big Stone Plant in the test period, but fail to recognize the increased revenues that would be forthcoming from sales by OTP of power from Big Stone.

The circuit court, in overruling the PUC on this issue, rested its finding on the fact that OTP was bound by contract to sell participation power at a fixed rate, which contracts would not expire until after the winter of 1976–1977.

As we view the record, there was a valid purpose in the adjustment adopted by the PUC. There was no uncertainty about the increased UMVPP rates going into effect, and there was little, if any, uncertainty about the amount of sales OTP would make from its Big Stone unit. Although the company was bound by the fixed contracts, the PUC was justified in considering that it would be inequitable for the retail customers to bear the higher costs of Big Stone without taking into account the fact that future sales would be made at a higher rate specifically designed to take into account the higher costs of the newer fossil units such as Big Stone. We find there was substantial evidence to support the decision of the PUC with regard to this item and that it was not arbitrary or an abuse of discretion.

We affirm the decision and order of the circuit court as it relates to Compensating

Bank Balances and Inflation Adjustments. We reverse with respect to Transmission Plant Allocation, Construction Work in Progress, and Power Pool Sales.

The case is remanded accordingly.

WOLLMAN, C. J., and DUNN and MORGAN, JJ., concur.

HENDERSON, J., concurs in part, dissents in part.

HENDERSON, Justice (concurring in part, dissenting in part).

The majority opinion upholds the PUC on the (1) Transmission Plant Allocation (2) Construction Work in Progress and (3) Power Pool Sales with which I am in accord. The majority opinion reverses the PUC on the Compensating Bank Balances and Inflation Adjustment. I would uphold the PUC on the Compensating Bank Balances and join with my colleagues in reversing the PUC on the Inflation Adjustment issue.

I do not believe the PUC acted arbitrarily and capriciously or abused its discretion with respect to compensating bank balances. The majority opinion and the trial court take a contrary viewpoint. There is no doubt that there is a three prong test as set forth in the majority opinion. It appears to me that the utility failed to meet its burden of proof and that is what the PUC held. The evidence, which is certainly substantial, upon which the PUC made its findings is essentially as follows:

1. Northwestern National of Minneapolis received a letter from OTP on January 12, 1976, which was a part of Exhibit A–21 and which stated: "Withdrawal by the Company of the compensating balances *was not legally restricted* at December 31, 1975." (Emphasis supplied). I say that this does not represent a clear legal obligation to maintain a fixed obligation.

2. A letter dated April 21, 1976, from the Citibank states the bank "anticipates" the company "will maintain average balances with us that will bear such relationship to this line of credit and your usage of the line as may be satisfactory to each of us from time to time." Again, this is not a clear obligation to maintain a fixed obligation; rather, it is an "anticipation" to do so.

3. A letter of the Irving Trust dated December 1, 1975, does not state, on its face, any compensating bank balances.

4. No mention is made of a compensating bank balance in a letter from the. Northwestern National Bank of Minneapolis.

5. A loan agreement dated October 15, 1975, between OTP and the State Bank of Burleigh County and the Bank of North Dakota contains no reference to a compensating bank balance.

6. OTP's president, when questioned about available financing arrangements, testified that Exhibit A–21, which. in part comprised the five points covered above, condoned the testimony of the financial vice-president: ". . . these credit arrangements are handled on a more informal basis that apparently the public believes." This is a far cry from the first requirement of the three pronged test that "the company must show that these balances *are contractually required.*" (Emphasis supplied).

The PUC was entitled to written documentation through OTP's records and it was not forthcoming. Not one bank official of any finance institution which extended credit to OTP ever testified during the hearing or otherwise presented testimony. Moreover, there was no testimony that the company had actively sought alternative financing arrangements to the maintenance or compensating balances. The PUC had an absolute right, under the evidence, to conclude that OTP had failed to prove that it actually maintained $246,427 in compensating balances.