MR. JUSTICE SHEEHY
dissenting:
I have tried in vain to reason with my colleagues not to take what I view as a backward step in the developing law of utility regulation in Montana.
The result is a majority opinion that is unwarranted, useless and contradictory. Unwarranted, because it is an intrusion on the right of the Public Service Commission to determine the methodology it uses for a reasonable rate of return on equity. Useless, because it sets the PSC to an impossible task, determining a market where no market exists. Contradictory, because it conflicts with itself, and because it contradicts Mountain States Telephone and Telegraph Company v. The Department of Public Service Regulation, et al., 1981, 624 P.2d 481, 38 St.Rep. 165.
Let us take the contradictions first. By statute the PSC “is not bound to accept or use any particular value in determining rates; provided, that if any value is used, such value may not exceed the original cost of the property ...” Section 69-3-109, MCA. *520 Moreover, the Commission is invested “with full power of supervision, regulation, and control” of public utilities. Section 69-3-102, MCA. The PSC decided under its broad power to follow the “California” approach and treat MDU’s subsidiary as a part of the utility for ratemaking purposes. The majority opinion pays pious lip service to the right of PSC to determine its own methodology in valuing the coal purchased from Knife River, but then contradicts itself. It is contradictory to require the PSC to determine: “1. If rate of return is used, a factual basis for the rate of return allowed Knife River considering its assets and rate of return on a market place basis comparable to other coal companies; or, 2. In the event market cost of coal is used sufficient facts to support the PSC determination of the fair market price for coal.” Those requirements are completely out of sync with the unitary method:
“... Thus under this [California] approach the question of whether the prices are reasonable is immaterial; all integrated parts of the utility are allowed the same rate of return ...” Washington Water Power v. Idaho Public Util. (1980), 101 Idaho 567, 617 P.2d 1242, 1248. (Emphasis added.)
The majority opinion also contradicts a position we took with respect to American Telephone and Telegraph Company and Mountain Bell. In Mountain States Telephone and Telegraph Company v. Department of Public Service Regulation, 1981, 624 P.2d 481, 38 St.Rep. 165, we refused to allow Mountain Bell to employ a “double leverage” in its rate base, arising out of funds in Mountain Bell’s capital structure borrowed from its parent AT&T.
This case is the inverse of the Mountain Bell situation. In Mountain Bell, supra, the utility was claiming that it should receive a rate of return 1 1.25 percent on its borrowed funds when AT & T was charging Mountain Bell 9.86.percent for the loans. We objected, saying “Mountain Bell’s common stockholders are ‘leveraged’ because Mountain Bell is paying less interest on its borrowed funds than the return it makes on the use of its borrowed funds.” 38 *521 St.Rep. at 167. Here, the investment in Knife River from the retained earnings of the MDU shareholders (or borrowed funds, whichever) is “leveraged” because the shareholders will make more money from their Knife River investment than the reasonable rate of return on equity found by PSC. That will be the net effect of the majority decision in the case.
The majority opinion if further contradictory in that it distinguishes AT & T and its subsidiary companies, saying the application of the unitary method as to AT & T is proper merely because AT & T is large enough to purchase nearly all of the manufactured products of its subsidiaries. What economic or regulatory reason logically exists to treat AT & T differently from energy utilities? The fact that a wholly-owned subsidiary may sell to others than its parent is. not a sufficient reason to require the rate-pavers of the parent to pay excessive costs. The implications of the majority opinion here will surely haunt us when future rate cases involve utilities which purchase fuel or power from the giant consortiums or joint enterprises of which the utilities are now becoming a part.
I also said that the majority opinion is unwarranted. I make that conclusion because the field of public utility regulation belongs exclusively to the PSC under our statutes and the methodology employed by it to determine a reasonable rate of return is exclusively its province. This would be a proper case for us to state as a rule that the PSC is not restricted to any single formula in determining the rate of return as long as the method followed does not result in an unjust and arbitrary result. Application of Mont.-Dak. Util. Co., Etc. for Authority to Establish Increased Rates for Electric Service (S.D.1979), 278 N.W.2d 189, 191. For a business with a guaranteed market, a guaranteed monopoly, and a guaranteed profit, a 12.124 percent rate of return on equity is not to be snubbed as arbitrary or unreasonable, even in these days.
I have also said that the majority opinion is useless, because it requires the PSC to make determinations that it has already made, and that are materially inconsistent with the unitary rate of return. The PSC carefully noted that it was not in any event attempting to *522 regulate Knife River or to regulate its profitabiltiy or to regulate its rate of return. MDU very carefully did not appeal from those findings of the commission.
The commission found that Knife River’s profitability of 33.43 percent on net fixed assets, when compared to PSC’s allowance of 12.124 percent rate of return on equity, was an “extreme” difference. It found that the only method of protecting the ratepayers from the excessive prices paid for coal was to limit the amount (but only for the rate base) that MDU would pay to Knife River for coal. After making its computations, which amounted only to the elimination of $283,661 of MDU’s income, PSC made the following findings:
“MDU has suggested that the transfer price of coal between MDU and Knife River be examined, and if it appears to be competitive, no adjustments be made. The Commission sees several disadvantages with this approach. First, the rate payer would be required to pay the going rate for coal regardless of the rate of return being earned by MDU shareholders as discussed above. Second, and most importantly, absolute comparability between coal prices is virtually impossible to determine due to a multitude of variables in mining operations, chemical composition of coal, transportation and other factors (for example, the composition of some coal may dictate the need for a more expensive boiler than other coals; which would be a cost for the utility but may not be reflected in the price per ton for coal) (A. S. Kane Rebuttal, page 28, line 14-31). Finally the bargaining between MDU and Knife River is not at arms length. Anytime an [sic] unitary entity bargains with itself, the results tend to be different than the results between bargaining between unrelated entities, (j. W. Wilson, Rebuttal, page 20, lines 5-25).
“MDU suggested that if the Commission intends to regulate Knife River’s rate of return that the fair market value of its reserves be used in determining that rate of return. Firstly, the Commission is not regulating Knife River’s rate of return. Rate of return has merely been used as a method of determining excessive coal prices. *523 Secondly, and as has been stated above, the Commission does not feel that MDU’s rate payer should be subjected to coal prices that would not exist if MDU and Knife River were a single corporation. Therefore, in computing the amount MDU will pay Knife River for coal, the Commission has used the amount of Knife River’s capitalization which closely matched the original cost depreciated valuation of its assets; the same method used in valuing utility property subject to regulation. This method of reporting is consistent with the financial reporting of all corporations, including natural resource companies.” PSC Order No. 4467, Par. 411, at 25-27.
The majority opinion is further useless,- because if it is followed, we will have to set aside the results in the next appeal. For example, the majority opinion requires PSC to determine “if a particular rate of return is fair and just for Knife River as compared to other coal companies.” The PSC is told to consider coal leases acquired at a cost to Knife River of less than $400,000 which contain coal reserves of 585 million tons with a market value of $93 million. It is told to disregard the original cost of the Beulah Mine, now depreciated. These are things that the PSC cannot do. It has no business or authority to determine a fair rate of return for Knife River Coal Co. The commission in its opinion carefully avoided in any manner regulating Knife River Coal Co. The $93 million figure for coal reserves is the fair market value of those reserves. By statute, the commission cannot consider such a figure, for it may not use any value in excess of the original cost of the property. Section 69-3-109, MCA. It would be nice for MDU if it could recover a profit on unmined coal reserves that are still in the ground, but that has no place in the rate-making process. The District Court properly took note of the fact that the United States Supreme Court rejected the contention that the assets of a natural resource company should be valued at market value because it is gradually depleting its assets in the course of its business operations. In Federal Power Com’n v. Hope Natural Gas Co. (1944), 320 U.S. 591, 606, 64 S.Ct. 281, 290, 88 L.Ed.2d 333, 347, the Supreme Court said:
*524 “By such a procedure the utilities are made whole and the integrity of its investment maintained. No more is required.”
Finally, the opinion is useless because it ought to be apparent to all, that a 33 percent return of profit in a single year is a good indication that no competition in the coal market exists.
The majority opinion, therefore, is amphigorv. It is a rigamarole of apparent meaning, but is basically meaningless.
In this proceeding, the commision granted an increase in operating revenues for the gas utility of MDU in the sum of $5,392,283 and a decrease in its electrical utility of $88,447. The deduction which the PSC made for excessive coal charges was $286,000 which represents approximately 5.3 percent of the increase. It is not the money but the principle over which the parties here are waging war. The utility has secured the rejection by this Court of the unitary or California approach to subsidiaries as arbitrary and unreasonable. This will prove to be a sorry day for rate-pavers.
I would uphold the findings of the PSC and affirm the decision of the District Court.