In the Matter of the Application of NORTHWESTERN BELL TELEPHONE COMPANY for an Increase in its Intrastate Rates (F–3442 AND F–3443).

No. 14723.

Supreme Court of South Dakota.

Argued May 20, 1985.

Decided Feb. 19, 1986.

Mary L. Vanderpan and David C. Jarratt, Asst. Attys. Gen., Pierre, for South Dakota Public Utilities Com'n; Mark V. Meierhenry, Atty. Gen., Pierre, and Alan J. Roth of Spiegel & McDiarmid, Washington, D.C., on brief.

Jeremiah D. Murphy of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, and Melvin R. Quinlan, Richard A. Karre, Ronald G. Lenhart and Perry W. Hooks, Jr., Omaha, Neb., for Northwestern Bell Telephone Co.

MORGAN, Justice.

This appeal arises from an application filed by Northwestern Bell Telephone Company (Company), with the South Dakota Public Utilities Commission (Commission), by which Company sought an increase of some $21.5 million dollars per year in intrastate rates. The results of a long and somewhat complicated procedure * were two Commission decisions allowing a net rate increase of $4,993,000.00. Company appealed that decision to the Circuit Court, Sixth Judicial Circuit, Hughes County, South Dakota. The decision of the circuit court is before us on appeal by the Commission in two aspects only: (1) The circuit court reversed Commission's disallowance of Company's claim that average cash balances should be included in rate base ($99,000.00); and (2) circuit court reversed Commission's disallowance of Company's claim for an inflation adjustment ($270,000.00). By stipulation between Company and Commission's staff, approved by Commission and accepted by the circuit court, appeal on all substantive issues except for the two noted above was foreclosed. We affirm and remand.

The evidence as adduced at the various proceedings will be discussed in conjunction with any issue to which it may be relevant. The issues as detailed by Commission are as follows: (1) The circuit court's decision should be reversed if Commission's decision was not clearly erroneous in light of the entire evidence in the record. (2) Commission's disallowance of the average cash balances from Company's working capital allowance in Company's rate base is supported by the evidence. (3) The Commission's disallowance of Company's requested inflation adjustment is supported by the evidence.

Company raises the procedural question as to whether Commission preserved the question of sufficiency of the evidence for review by failure to request appropriate findings of fact and by failure to make relevant written objections to Company's proposed findings of fact.

■ Obviously, we must examine Company's procedural question first. SDCL 15–26A–8 provides, in pertinent part: "Such ... matters ... as may have been timely presented to the trial court by motion for directed verdict, request for findings, or other [appropriate] motion, offer, or objection may be reviewed on appeal[.]" As pointed out by this court in *Burke v. Lead-Deadwood Sch. Dist. No. 40-1*, 347 N.W.2d 343 (S.D.1984): "The thrust of this statute is twofold. On the one hand, it will not allow a party, upon review, to profit from its own failure to act. On the other, it protects the trial court's right to rule cor-

---

* The South Dakota Public Utilities Commission established a separate docket and proceedings relating to the effect of the divestiture of Northwestern Bell Telephone Company from American Telephone and Telegraph Company.

rectly." 347 N.W.2d at 344. A review of the record discloses that subsequent to the trial court's memorandum opinion, Commission filed proposed findings of fact and conclusions of law as well as objections to anticipated findings and conclusions from Company. A stipulation was then entered into which provided: "The Commission may appeal to the Supreme Court on the issue of the average cash balance in working capital and the inflation adjustment." Both parties waived their rights to appeal all other issues. The stipulation further provided that the trial court could enter its judgment on the basis of its memorandum decision. At the time the trial court approved this stipulation, and when it entered Company's proposed findings of fact and conclusions of law to the decision, it had before it in the file Commission's proposed findings filed subsequent to the memorandum decision and prior to the stipulation. The statutory requirement and the *Burke* decision thereon were clearly met.

█ We then examine the first issue, our scope of review. Commission has framed its issues in terms of whether or not Commission's decision was clearly erroneous in light of all of the evidence in the record. Company argues that the proper scope of review on this appeal is whether the circuit court's findings were clearly erroneous.

Company's argument is based on the 1983 legislative amendment to SDCL 1–26–37 which, as amended, reads:

The aggrieved party or an agency may obtain a review of any final judgment of the circuit court under this chapter by appeal to the Supreme Court. The appeal shall be taken as in other civil cases. The Supreme Court shall give the same deference to the findings of fact, conclusions of law and final judgment of the circuit court as it does to other appeals from the circuit court. Such appeal may not be considered de novo. (Amendment underlined.)

As was pointed out in a footnote to *State Div. of Human Rights v. Miller,* 349 N.W.2d 42, 46 n. 2 (S.D.1984):

Even if we apply SDCL 1–26–37 as amended, the required deference to the circuit court nevertheless appears not to have changed. As amended, we decide whether the circuit court was clearly erroneous in determining that the agency was clearly erroneous. This reverts us to the agency record. If after review of the evidence we deem the agency findings clearly erroneous, we affirm the circuit court. If the agency findings are not clearly erroneous, then the circuit court was clearly erroneous in so concluding. It follows that, in the final analysis, we still review essentially as did the circuit court.

Subsequent to that, in *Matter of S.D. Water Mgmt. Bd.,* 351 N.W.2d 119, 122 (S.D.1984), we affirmed our holding as follows:

In ... *State v. Miller,* 349 N.W.2d 42 (S.D.1984), we decided that despite the new language in the statute, this court still reviews the administrative decision essentially in the same manner as did the circuit court; the required deference to the circuit court has not changed. (Emphasis in original.)

We read the 1983 amendment in the light of SDCL 15–6–52(a) and the subsequent decisions of this court. The statute, in pertinent part, provides: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." In *Geo. A. Clark & Son, Inc. v. Nold,* 85 S.D. 468, 474, 185 N.W.2d 677, 680 (1971), when discussing evidence submitted by deposition, this court said: "Since [the deponent] did not appear before the court when testifying we have reviewed his testimony as though presented here in the first instance. Consequently, the clearly erroneous rule of SDCL 15–6–52(a) does not apply. In other words, it is not burdened with a presumption in favor of the trial court's determination." Earlier, in *State Automobile Casu-*

*alty Under. v. Ruotsalainen*, 81 S.D. 472, 479, 136 N.W.2d 884, 888 (1965), we have said: "With the testimony presented to the trial court [by deposition] there is no presumption in favor of the trial court's determinations. Accordingly, it is our duty to review the evidence and determine the issues involved as though presented here in the first instance." (Citations omitted.) In an administrative appeal, the trial court's decision below is based entirely on the written record from the agency. We are fully as capable of reading the agency record as was the trial court. We therefore review the agency record in the same light as does the trial court to determine whether or not the agency's decision was clearly erroneous in light of all the evidence in the record. SDCL 1–26–36.

Turning to the merits of this appeal, we first examine Commission's contention that the evidence in its entirety is sufficient to justify its decision to deny inclusion of Company's average cash balance in its rate base.

Commission stated in its decision and order (F–3442):

> The Commission finds that to the extent average cash balances are used to pay for plant already included in rate base, the Company will earn in effect, a double return on those plant items if the Company is allowed to include average cash balances in its working capital requirement..... The Commission finds therefore, that under the Company's proposal, both the plant item and that portion of cash balances used to pay for it will earn a return. For this reason, the Commission finds that average cash balances and working funds should not be included in the calculation of the Company's working capital requirement.

The Commission staff had proposed the elimination of average cash balances from Company's working capital allowance for several reasons; but the only reason for Commission's action is that set out above. Company, on its part, had argued against this reasoning on the basis that it involved the timing of plant in rate base in which the staff had made no attempt to quantify.

The circuit court, in reversing Commission's action on this issue, found that Commission's claim that Company will earn a double return to the extent some unquantified portion of average cash balances might have been used for plant also included in the rate base is immaterial and is insufficient reason for excluding all cash from Company's rate base. The court further found that Commission's argument on this issue rests more on "speculation and assumption than upon fact or reasonably demonstrable projections." *Citing N.W. Pub. Serv. v. Cities of Chamberlain, Etc.*, 265 N.W.2d 867, 879 (S.D.1978).

Regulated utilities are allowed a return or profit on their rate base with the cost of physical plant and amounts for working capital and related allowances. A "cash working capital" allowance is included in the rate base to provide the cash required to cover the lag between the utility's disbursement of funds and its subsequent recovery of those expenses from ratepayers.

"The return on a utility's investment in property employed in providing service to the public should be '... sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit'[.]" 265 N.W.2d at 873, *quoting Bluefield Co. v. Pub. Serv. Comm.*, 262 U.S. 679, 693, 43 S.Ct. 675, 679, 67 L.Ed. 1176, 1183 (1923).

■ SDCL ch. 49–34A vests the ratemaking power in Commission with the concommitant responsibility to balance the utility's need for adequate revenue with the public's right to just and reasonable rates. Commission is neither a consumer advocate nor a utility advocate.

Commission has adopted a "cost of service" method for determining rates. The adopted method entails four steps: (1) determination of Company's rate base, i.e., investment devoted to public service, (2) determination of a fair and reasonable rate of return, (3) multiplication of the rate base

by the rate of return, and (4) addition of Company's cost of operations.

On appeal, Commission contends that bare assertions of the reasonableness or need for including average cash balances in the rate base must be specifically proven and that the burden is on Company. Company's witness testified that the amount of cash working capital included in the rate base has two components: (1) the investment required to maintain minimum cash balance, and (2) accounts receivable from customers less accounts payable and taxes payable. He also testified that the cash balances were required for daily operations and that the use of cash balances was consistent with the lead-lag study and an appropriate measure of the minimum cash required for Company's daily operations. Company's witness pointed out that cash cannot be managed as precisely as Commission's lead-lag study implies. He noted, however, that Company would not maintain a cash balance in excess of daily needs because any excess could be more profitably invested.

Commission argues that Company failed to carry its burden to prove that its average cash balances were justified as additions to the lead-lag allowances and that the cash balances are attributable to ratepayer prepayments, which Company had not taken into account. Commission's burden of proof argument is premised on this court's decision in *Cities of Chamberlain, supra,* as is Commission's allegation that "generalized contentions" regarding the need for average cash balances in daily operation of Company are inadequate.

■ Company presented direct evidence in its case-in-chief to: (1) support the inclusion of cash balances in the rate base, (2) document the amount of average cash balances, and (3) establish that the average cash balances represented the minimum cash requirements for day-to-day operations. Commission insists that the testimony by Company's witness, an outside accountant, to the effect that Company manages cash resources in a manner which minimized their necessary average cash

balances in order to prevent the loss of interest income for more profitable investments, was a "generalized contention" and insufficient to justify the amount of claims. In *South Dakota Public Utilities v. Otter Tail,* 291 N.W.2d 291, 295 (S.D.1980), we considered, along with other evidence presented, a Company official's testimony that "he actively sought the optimum financing arrangements available[.]" We held the evidence supported the conclusion that Company satisfied its burden and that Commission's action regarding the composition of the rate base was arbitrary and capricious. With respect to Commission's determination that, to the extent average cash balances are used to pay for plant already included in the rate base, Company will earn in effect a double return, Company points out that neither the Commission nor the staff witnesses proposing the disallowance made any attempt in the record below to either demonstrate the existence of this alleged double earning or to quantify an offsetting amount. Commission's response to this argument is that the burden is on the applicant company to show that its rates are just and reasonable and not on the staff to show that they are not. This situation is not unlike that which we dealt with in *Cities of Chamberlain, supra,* wherein the cities sought to offset increased payroll costs, the amount and certainty of which were not in dispute, by increased worker productivity and possible gains in efficiency through the adoption of technological improvements. In *Cities of Chamberlain,* we said: "Although it has been held that such offsets to increased costs are proper when established by the record ... we view the testimony of cities' witness regarding this question as resting more upon speculation and assumption than upon fact or reasonably demonstrable projections." 265 N.W.2d at 879. This was the reasoning of the trial court below and we affirm its decision with regard to average cash balances.

The second substantive issue involves Commission's denial of any inflation adjustment (IA) and the trial court's reversal of

that portion of the decision. Company proposed an IA equal to one-half of the increase in the Consumer's Price Index (CPI) between the beginning and the end of the test year, with such adjustment to be applied only to operating expenses not otherwise adjusted or not otherwise in need thereof. The staff opposed any IA upon three grounds: (1) Company had failed to calculate any adjustment in operating expenses to reflect the efficiencies in operations related to advances in productivity; (2) Company had failed to show the validity of the application of the CPI as a barometer because of numerous factors used in the CPI that are alien to Company's operation, *e.g.*, costs of health, recreation, food, home ownership and apparel; and (3) staff's return on equity in this case is higher than it would be in a noninflationary economy.

Commission generally adopted staff's position and made a specific finding of fact that disallowance of the proposed IA was particularly proper because although there was substantial evidence of cost-saving efficiencies and advances in productivity, Company had failed to calculate any adjustment to operating expenses to reflect those gains. Beyond the staff's stated position, Commission also found that our mandate in *Otter Tail, supra,* only relates to electric utilities and that the rate of inflation has fallen to less than four percent since Commission's initial *Otter Tail* decision. Thus, we determine Commission's decision to be grounded on two principles: (1) *Otter Tail, supra,* is not applicable; and (2) it is proper to offset IA with "cost-saving efficiencies and advances in productivity."

In reversing Commission's decision on this issue, the trial court found: (1) that Commission may not ignore the effects of inflation as per the *Otter Tail* decision, that Company's proposed IA is similar to IA's allowed in other utility cases and that Commission's distinction between telephone and electric utilities has little merit; (2) that Company's IA reflected the effect of inflation on Company's operating expenses in the test year—it was applied only to operating expenses not otherwise adjusted

or not otherwise in need thereof and it was based on only one-half of the CPI increase over the test year; and (3) that the evidence in the record relating most directly to productivity was Company's inability to reach authorized rates of return in two previous years (in 1980 Company realized 9.3% return while authorized 10.35%, and, in 1981, realized 7.62% return while authorized 10.58%), the record contains no study or data and very little testimony to support the effect of productivity against IA and Commission's productivity argument rests far more upon speculation and assumption than upon fact or a reasonably demonstrable projection.

■ We would first note that we see no reason why our statement in *Otter Tail, supra,* "to disallow any inflation adjustment is unrealistic and unwarranted" is any the less applicable in telephone rate cases than it is in electric rate cases. Happily, the rate of inflation appears to have fallen in recent times to less than four percent according to the record. It has not, however, approached zero percent which Commission would equate with a reasonable allowance.

■ The reason for disallowance that Commission stresses appears to be an offset of the proposed IA for some unquantified gain by Company due to cost-saving efficiencies and advances in productivity. Commission's findings stated that "disallowance of Company's proposed inflation adjustment is particularly proper because of the substantial evidence in this case of cost-saving efficiencies and advances in productivity which the company has realized during the test year." And, further, "the Commission finds that Company has failed to calculate any adjustment to operating expenses which reflects these efficiencies and increased productivity gains." Commission then goes on to adopt the staff's argument that such an adjustment would offset the effect of inflation during a period of low inflation although it might not during times of higher inflation. Staff's supposition sounds purely conjectu-

ral, for surely if they had succeeded in quantifying this purported gain, it could be applied to operating costs' projections to which it truly related and not used as some sort of trade-off. As a company witness pointed out, productivity relates to levels of input in relation to levels of output, a factor totally unrelated to price changes of doing business by reason of inflation.

In *Otter Tail, supra,* where Commission had questioned Otter Tail's use of the standard inflation guidelines, the wholesale price index and the consumer price index, we stated: "In the absence of any guidelines set forth by the PUC for the development of an inflation adjustment by investor-owned utilities, or to adopt an inflation adjustment on its own, it appears that a failure to recognize these increased costs, as presented by OTT, was an arbitrary decision." 291 N.W.2d at 296. We find the same reasoning applicable to the so-called productivity factor. If there is such a factor, the PUC should adopt the guidelines to isolate and apply it, particularly, as we note staff used the same argument and Commission adopted it in adjusting Company's proposed return on equity. In *Application of Northwestern Public Service Company,* 297 N.W.2d 462, 470 (S.D.1980), we stated: "It is settled that the PUC is allowed to exclude increased payroll expense where it is shown to be offset by increased productivity." (Citation omitted). We therefore agree with the trial court's determination that Commission's productivity argument rests far more upon speculation and assumption than upon fact or a reasonably demonstrable projection.

We affirm the trial court's decision and remand to the circuit court with directions to remand for further action consistent with this opinion.

. FOSHEIM, C.J., HENDERSON, J., and EVANS, Circuit Judge, concur.

HERTZ, Circuit Judge, acting as a Supreme Court Justice, not participating.

EVANS, Circuit Judge, sitting for WUEST, J., disqualified.