APPLICATION OF NORTHWESTERN BELL
TELEPHONE COMPANY
(98 N.W.2d 170)
(File No. 9764. Opinion filed September 15, 1959)

16

**Martens, Goldsmith & May,** Pierre, **John A. Anderson, Walter D. James, Jr., Allan L. Grauer,** Omaha, Neb., for Appellant, Northwestern Bell Telephone Co.

**M. Q. Sharpe,** Kennebec, for Respondents.

ROBERTS, J. This appeal involves the application of the Northwestern Bell Telephone Company, hereafter referred to as the Company, to increase intrastate telephone rates and charges. The application together with proposed rate schedules designed to increase the annual net revenues of the Company by approximately $500,000 was filed on February 14, 1958, with the Public Utilities Commission of South Dakota, hereafter referred to as the Commission. October 18, 1957, the Commission had denied a prior application for a general increase in rates, but authorized a rate group reclassification which as found by the Commission would produce additional revenue of $500,000 and a return based upon the 1956 level of operations of about 5.9 per cent. In the application in the instant proceeding, the Company alleges that the Commission by such order establishing present rate schedules had failed to make proper adjustments for known changes affecting plant investments and operating costs in the immediate future; that plant investments in South Dakota during 1957 increased by more than $6,350,000 and that during the final quarter of that year the Company entered into a contract with the labor union representing its employees which increases its annual wage cost by approximately $366,000; that the construction program of the Company in South Dakota for 1958 will exceed $7,000,000; and that the present application is made for the purpose only of restoring the net earnings of the Company to the level determined by the Commission in its order of October 18, 1957, to be reasonable.

Hearing was had and under date of May 18, 1958, the Commission filed its report and made and entered its order denying the application. The Commission on July 28 following filed a report containing additional findings and entered its order denying petition for rehearing. The Company in addition to claimed errors in the decision of the Commission sought a rehearing for the purpose of introducing evidence of actual operating results in 1958 and pointed out that almost six months of the year had already elapsed. The Company appealed from these orders to the Circuit Court

of Hughes County. From the judgment of that court affirming the orders, the Company appealed to this Court.

The Commission adopted a rate base of $28,130,179, taking the book values of the Company as correct. It found $27,555,742 to be the average net investment in plant for the year 1957 and to this added $387,500 for the average amount of materials and supplies on hand and $186,937 for average working capital. The Commission in its decision expressed the opinion that in the case of an expanding utility a rate base cannot be fairly calculated by using year end investments since revenues for a period of twelve months more properly relate to a plant in existence over that period of time.

The Company introduced evidence of an additional net plant investment of $716,764 resulting from replacement of equipment at its Aberdeen exchange which was placed in service January 19, 1958. Adding this amount to the 1957 year end net intrastate investment of $29,827,808, the Company contended for a rate base of $30,526,681 as of January 31, 1958. The Commission refused to consider the base proposed for the reason that it extended beyond the cutoff date of December 31, 1957.

The Commission computed the 1957 intrastate net earnings to be $1,631,643. This included an adjustment upward of $238,599 for the purpose of reflecting increased earnings resulting from the order of October 18, 1957, and adjusted downward estimates of $86,866 for wage increases, $17,834 for tax increases and $6,703 for group insurance effective in 1958. The Commission found that the net earnings thus computed would provide a net return of 5.8 per cent on the rate base of $28,130,179.

The Commission rejected two adjustments sought by the Company. It asked a reduction of $38,699 in earnings to reflect an increase in casualty expenses and an adjustment upward in earnings by $8,598 which represented increased net earnings resulting from reduction in operating expenses effected by the conversion at the Aberdeen exchange. The

Company claimed net earnings for the year 1957 of $1,601,542 which would mean a return of 5.24 per cent on its proposed rate base of $30,526,681.

The Company contends (1) that the Circuit Court erred in failing to exercise its independent judgment on the law and the facts and (2) that the orders of the Commission are unreasonable and confiscatory and that there were errors in the determinations of the Commission in these particulars: (a) that the Commission in fixing a basis for computing fair and reasonable rates used an arbitrary cutoff date of December 31, 1957, and refused to consider the latest available data, thus excluding from the rate base a substantial amount in intrastate investment resulting from a replacement of equipment at the Aberdeen exchange which was completed in January 1958; (b) that the Commission should have made an adjustment for annual casualty expenses that could be reasonably expected in the future; (c) that the Commission by adopting a theory that a utility carrying on a large construction program is not entitled to a reasonable return interfered with the managerial functions of the Company and penalized it financially; (d) that the Commission failed to make provision for the attrition or decline in rate of return which results from adding plant at present high cost; and (e) that the Commission considered and relied upon interstate operations over which it has no jurisdiction.

The record discloses that the Company is one of twenty-two operating subsidiaries of the American Telephone & Telegraph Company commonly known as A. T. & T.. The Company provides local exchange and intrastate toll service in this state and in conjunction with other subsidiaries and independent telephone companies and the Long Lines Department of A. T. & T. also provides interstate toll service. A. T. & T. owns all or substantially all the stock of Western Electric Company which manufactures, purchases and distributes apparatus, equipment and supplies for the companies included in the Bell System and of Bell Laboratories, Inc., which performs research, development and design work for the Bell System. During the time here in question the Company by virtue of a license contract paid to A. T. & T.

for services performed one per cent of its gross annual revenues. It also appears that A. T. & T. sells its stock to or borrows money from the public and holds the proceeds from the security issues in a fund for the purpose of enabling it to loan money to its subsidiaries.

The same equipment is used by the Company in rendering intrastate and interstate services and in the field of regulation the separation of investment, revenues and expenses becomes essential. Mr. Wade M. Meintzer, employed by the Company as a statistician, testified at length concerning its books and accounts. He testified that all records and accounts are kept on a total state basis and that an allocation of revenues and expenses to intrastate and interstate operations commonly designated as separation is made only for the purpose of a rate proceeding. A Separations Manual has been prepared by representatives of the National Association of Railroad and Utilities Commissioners and the Federal Communication Commission and has been generally accepted by state regulatory agencies. The witness further testified: "In separating the telephone plant investment, revenues, and expenses between interstate and intrastate operations for the purpose of this rate hearing I have followed the principles contained in the Separations Manual * * *. Exhibits were delivered to the Commission about March 13th or 14th. At that time, the latest available information as to South Dakota intrastate operating results was the twelve month period ending December 31, 1957. In the meantime, intrastate operation results for January, 1958, have become available. * * * The company's net investment in intrastate plant and equipment as of January 31, 1958 * * * amounts to $30,528,681. The only significant change in this investment figure involves the investment changes resulting from the central office equipment replacement at Aberdeen. The Aberdeen replacement was placed in service on January 19, so that the changes in plant investment resulting from this replacement are now actually reflected in our books as plant in service." The witness further testified that the Company was unusually fortunate in experiencing only a negligible amount of casualty expense in the year 1957 and that the

adjustment increase relied upon by the Company for casualty expenses is founded upon storm damage occurring in the past ten years and that the adjustment proposed is the average for that period modified to take into consideration the change in composition of plant and current cost levels.

It appears from exhibits introduced by the Commission that the Company had in this state a total year end investment in plant in 1954 of $40,286,433; 1955, $42,747,938; 1956, $45,419,778; and 1957, $50,919,283. The increase in plant investment for the year 1957 was about 12 per cent. The average annual increase for the three prior years was about 6.7 per cent. In the year 1957 there was an increase of 6696 or 4.73 per cent in the number of telephones in operation. During the three preceding years there was a yearly average increase of 6473 or 5.05 per cent.

Mr. Elwin Quinney, an engineer employed by the Commission, testified: "From the foregoing it seems evident to me that, with the continued normal growth in revenue producing units, the Company can, under present rates, add about three million dollars to its plant investment per year, which should be sufficient to provide for such normal growth and permit it to continue the conversion of its remaining twenty-five manual exchanges to dial operation at a rate of five or six per year. If it is necessary to speed up a program of direct distance dialing by immediately reconverting such exchanges as Huron, Pierre, Madison and Yankton to direct distance dialing, then I would say any increase in revenue required for such program should come from an increase in toll rates, as that is the service that will receive the direct benefits from such reconversions. Direct distance dialing will of course speed up and improve long distance toll service, but it will not add anything to the present local exchange service."

The Company insisted that the Commission admit proof of and allow for anticipated capital additions. The theory of counsel for the Company appears from the following offer of proof: "There has been a lot of speculation by other people as to what is going to be taking place in the future in 1958. Mr. Quinney's tetimony is based upon that specula-

tion. We think we are entitled to put in a study we have made on the basis of known facts as to what is going to happen during this year. It is entirely normal in a rate case to make such estimates for the future."

The Commission received in evidence with the comment that it was not inclined to give very much consideration to that which is speculative an exhibit showing cost of plant plus material and supplies and working capital less depreciation reserve as of December 31, 1958. The exhibit shows that amount to be $33,773,000 and net earnings of $1,645,000. On that basis according to this exhibit, existing rates would produce a return of 4.87 per cent and the rates herein proposed would return 5.56 per cent.

 Scope of Judicial Review. The statute, SDC 52.0208, declares that the rates of common carriers including telephone companies shall be "reasonable and just" and that every "unjust and unreasonable" rate is prohibited and declared unlawful. The power of the Commission to investigate, fix and regulate intrastate telephone rates is conferred by the provisions of SDC 52.0216. Rate making is a legislative process whether done directly by the legislature or by an agency of its creation. Farmers' Educational and Cooperative Union v. Circuit Court, 73 S.D. 203, 40 N.W.2d 402. The legislative discretion implied in the rate making power extends to the process by which a legislative determination is made and within the broad field where that discretion is operative legislative determinations are conclusive. Los Angeles Gas & Electric Corporation v. Railroad Commission, 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180; Dayton Power & Light Co. v. Public Utilities Commission, 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267. So long as a legislative agency pursues its authority and does not transgress constitutional limitations, the courts have no power to interfere with its determinations.

SDC 52.0502 provides that the "final record or judgment roll before the Public Utilities Commission" certified to the circuit court "shall constitute the record in said Court, and no additional evidence shall ever be received".

The circuit court on an appeal "may affirm, reverse or modify" an order of the Commission or "remand the cause" with directions for further proceedings, SDC 52.0504. From an order, judgment, or determination of that court, SDC 52.0505 grants the right to appeal to the Supreme Court. The powers of the reviewing courts are purely judicial and the review does not extend beyond the question whether the Commission has acted within its constitutional or statutory powers and whether its order or determination is supported by substantial evidence and is reasonable and not arbitrary. Application of Northwestern Bell Telephone Company, 69 S.D. 36, 6 N.W.2d 165; In re Northwestern Bell Telephone Company, 73 S.D. 370, 43 N.W.2d 553, 556. It may be assumed that the Company tendered an issue as to whether the allowed return will within the immediate future become confiscatory, and that it was entitled to a judicial determination of such issue. The property of a public utility is as effectually confiscated by requiring its use for inadequate compensation as by a taking for less than its true worth. In considering the issue of confiscation this court in the case last cited said: "Confiscation is merely the taking of private property without just compensation, and offends the Constitution. If the property itself is taken by eminent domain, just compensation is its value at the time of taking. If the legislature, either by its own act or through the creation of an administrative agency, prescribes rates or charges for a public utility, the use of the property is taken, and just compensation is a reasonable rate of return upon the value of the property at the time it is being used for the public service. In other words, a utility is entitled to rates that will yield a reasonable rate of return after payment of operating expenses, taxes and financial charges, for the use of the property devoted to public service. Anything less than that is unfair and unreasonable."

The Company insists that the Circuit Court failed to determine the law and the facts relating to the issue of confiscation and to apply its independent judicial judgment thereto. The Court as we have indicated was not bound by conclusions of the Commission as to any question of law and its inherent power to determine constitutional

questions could in no manner be impaired by the regulatory statute. But this does not give the Company the right to submit evidence before the court and to have judicial findings based thereon. In St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 726, 80 L.Ed. 1033, the Court in discussing a somewhat analogous contention said: "But this judicial duty to exercise an independent judgment does not require or justify disregard of the weight which may properly attach to findings upon hearing and evidence. On the contrary, the judicial duty is performed in the light of the proceedings already had and may be greatly facilitated by the assembling and analysis of the facts in the course of the legislative determination. Judicial judgment may be none the less appropriately independent because informed and aided by the sifting procedure of an expert legislative agency. Moreover, as the question is whether the legislative action has passed beyond the lowest limit of the permitted zone of reasonableness into the forbidden reaches of confiscation, judicial scrutiny must of necessity take into account the entire legislative process, including the reasoning and findings upon which the legislative action rests. * * * The established principle which guides the court in the exercise of its judgment on the entire case is that the complaining party carries the burden of making a convincing showing and that the court will not interfere with the exercise of the rate-making power unless confiscation is clearly established." There is no claim that the procedure before the Commission and review on appeal is inadequate to preserve for judicial review an issue of confiscation. The court below recognized that the legislature could not preclude scrutiny and determination by the court as to whether or not the rates prescribed by the Commission are or will in the immediate future become confiscatory and obviously reached the conclusion that the Commission acted within the permissible zone of reasonableness. We need not consider the extent to which the Supreme Court has receded from the doctrine of the St. Joseph case with respect to the exercise of independent judgment in cases of claimed confiscation. Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 62

S.Ct. 736, 86 L.Ed. 1037; Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct 281, 88 L.Ed. 333; Davis, Administrative Law, § 29.09. The more circumscribed rule would not require a different result.

Rate Base. The Commission as we have stated is charged with the statutory duty of determining whether proposed rates are "reasonable and just". The legislature has prescribed no other standard. Prior to the decision of the Supreme Court in Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333, decided in 1944, the valuation of property as the basis for the fixing of rates required consideration of constitutional principles as enunciated in the famous case of Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819. The Supreme Court there held that a public utility was entitled to a fair return upon the fair value of property used by it in rendition of service to the public. The Court did not attempt to define value, but enumerated certain elements that had to be considered in calculating fair value and this meant present fair value as later decided in Willcox v. Consolidated Gas Co., 212 U.S. 19, 29 S.Ct. 192, 53 L.Ed. 382. These elements included the original cost of the property and reproduction cost at the time of valuation. The constitutional mandate of present fair value was implied in every statute dealing with the fixing of rates. In the Hope case, the Court rejected the fair value formula as a constitutional requirement and reaffirmed its holding in Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037, that in determining reasonable rates a regulatory agency is not bound by "any single formula or combination of formulae". [320 U.S. 591, 64 S.Ct. 287] In the words of the Court, "it is the result reached not the method employed which is controlling. * * * If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. * * * And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." The rejection of the test of fair value as an element of due

process obviously would not require or justify disregard of such basis of fixing rates if a statute has adopted such concept of fair value and requires that rates must yield reasonable return upon that basis. Cf. Northern States Power Co. v.Public Service Commission, 73 N.D. 211, 13 N.W.2d 779; City of Hagerstown v. Public Service Commission, 217 Md. 101, 141 A.2d 699; New York Telephone Co. v. Public Service Commission, 309 N.Y. 569, 132 N.E.2d 847. As we have noted, there is no statute in this state prescribing fair value or other rate base in establishing valuations for rate making purpose.

In the field of rate regulation, the usual method employed is the determination of a rate base reflecting the value of the property of the utility whose rates are being fixed. In the City of Detroit, Mich. v. Federal Power Commission, 97 U.S. App.D.C. 260, 230 F.2d 810, 818, the Court in referring to the rate base method said: "It has been repeatedly used by the Commission, and repeatedly approved by the courts, as a means of arriving at lawful—'just and reasonable'—rates under the Act. Unless it is continued to be used at least as a point of departure, the whole experience under the Act is discarded and no anchor, as it were, is available by which to hold the terms 'just and reasonable' to some recognizable meaning. It may be thought that our reference to the rate-base method, as well as our holding that the Commission's use of the field price is invalid because not properly related to the public interest by the evidence and findings, is inconsistent with the 'end result' test employed by the Supreme Court in the Hope case. We think not. That test was applied in assessing the reasonableness of rates from the company's point of view. See 320 U.S. at page 603, 64 S.Ct. at page 288. The factors comprising the test were enumerated by the Court—successful business operation, maintenance of financial integrity, attraction of necessary capital, and compensation of investors for risks assumed. See 320 U.S. at page 605, 64 S.Ct. at page 289. From the consumer standpoint no such criteria are available." To the same general effect is State v. Tri-State Tel. & Tel. Co., 204 Minn. 516, 284 N.W. 294, 300, in which the

Court used the following language: "Likewise in the case of due process the single finding that existing rates are unreasonable is a conclusion and insufficient unless supported by findings of fact more particularly stated which demonstrate the grounds upon which the conclusion is based so that the court may determine whether the order proceeds from a conscientious consideration of the evidence or is arbitrary." See also New England Tel. & Tel. Co. v. Kennelly, 81 R.I. 1, 98 A.2d 835; Commonwealth Telephone Co. v. Public Service Commission, 252 Wis. 481, 32 N.W.2d 247; Petition of New England Tel. & Tel. Co., 115 Vt. 494, 66 A.2d 135; Acme Brick Co. v. Arkansas Public Service Com., 227 Ark. 436, 299 S.W.2d. 208. It thus appears that the rate base method is not inconsistent with the "end result" theory of the Hope case. The Supreme Court in a later case, Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206, stated that the Federal Power Commission was not precluded from using the rate base method. While the Commission is not bound to follow any single formula or combination of formulae, it must appear that the method followed and its order fixing rates as applied to the facts and viewed in its entirety do not produce an unjust or arbitrary result.

The Company's book cost of plant and equipment in intrastate service less depreciation reserve plus materials and supplies and working capital were accepted by the Commission as correct for the test year 1957. The Commission as heretofore indicated did not calculate the rate base as of the end of the test year, but averaged the net investments at the beginning and at the end of that year. The Commission points out that it is the plant in service throughout the test year from which revenues are derived and to reach a fair judgment of rates to be established or of existing rates it is, in the opinion of the Commission, proper to relate earnings for the test year to an average rate base. We do not think that the Commission in using the book cost method was required to calculate the rate base as of the end of the test year, and was not bound to follow its past practice of using a year end rate base. See Narragansett Electric Company v. Kennelly, R.I., 143 A.2d 709.

The Company contends that the Commission erred in arbitrarily adopting December 31, 1957, as a cutoff date and in refusing to include in the rate base $716,764 representing property placed in service in January 1958. This amount was expended for replacement of equipment at the Aberdeen exchange and not to expand the telephone plant. It was argued that the improvement would not produce a commensurate increase in revenue and that the Commission should not have ignored this evidence which substantially affected the determinative issue before it. The Commission answers this contention by pointing out that the Commission in its discretion may use a base year in arriving at a final determination and that although this property will be in the rate base in the future, the Commission cannot look to the past for earnings and to the future for the rate base.

We cannot agree with the view that the Commission exceeded the bounds of legitimate discretion in fixing a cutoff date. As the Commission says, the purpose of the cutoff date is to provide a time when plant, revenues, and expenses can be correlated. Although findings may be made primarily on test year figures this does not mean that adjustments may not be made to reflect typical conditions. It was observed by the court in Federal Power Commission v. Natural Gas Pipeline Company, 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037, that a regulatory agency is free to make "pragmatic adjustments" which may be called for under the circumstances. Although the court in Duquesne Light Co. v. Pennsylvania Public Util. Com'n, 174 Pa.Super. 62, 99 A.2d 61, 64, recognized the necessity and propriety of a cutoff date and the use of a base year, the decision points out: "At the same time the Commission, in determining rates which are prospective, should consider the latest available relevant data. Admittedly the Commission is granted a wide area of discretion as to the extent and the type of adjustments to be made to base year figures." Adjustments, of course, must be based on evidence and should not be unfavorably weighed either for or against the utility.

The Company in support of its contention that the estimated value of the improvement should have been used

in determining the rate base cites McCardle v. Indianapolis Water Company, 272 U.S. 400, 47 S.Ct. 144, 148, 71 L.Ed. 316, wherein the Court said: "It must be determined whether the rates complained of are yielding and **will yield,** over and above the amounts required to pay taxes and proper operating charges, a sum sufficient to constitute just compensation for the use of the property employed to furnish the service; that is, a reasonable rate of return on the value of the property at the time of the investigation **and for a reasonable time in the immediate future."** And in Columbus Gas & Fuel Co. v. Public Utilities Commission, 292 U.S. 398, 54 S.Ct. 763, 767, 78 L.Ed. 1327, 91 A.L.R. 1403, the Supreme Court said: "There will be no need in the computation of the rate base to include the * * * value of (assets) not presently in use, unless the time for using them is so near that they may be said, at least by analogy, to have the quality of working capital. * * * Postponement of * * * profit until the stage of **imminent or present use** is not an act of confiscation, but a legitimate exercise of legislative judgment." The use of the property in question at the end of the base year was imminent and should have been included in the rate base unless factual reasons found by the Commission warranted its exclusion. Property under construction, although it has reached the point of imminent use, should not be included in the rate base if inclusion results in a double return because of additional revenue resulting therefrom. New England Tel. & Tel. Co. v. State, 95 N.H. 353, 64 A.2d 9; State v. Tri-State Tel. & Tel. Co., 204 Minn. 516, 284 N.W. 294; Southwestern Bell Telephone Co. v. State, 204 Okl. 225, 230 P.2d 260; Petition of New England Tel. & Tel. Co., 115 Vt. 494, 66 A.2d 135. It was admitted that there would be some decrease in expenses of operation because of the conversion, but there is no evidence that would justify exclusion in order to prevent a double return.

The findings of the Commission are based primarily on test year figures, but in determining rates which are prospective the Commission as we have indicated may make adjustments in base year figures. We think that the Commission exceeded its authority in not making an adjustment

to include the the cost of replacement at the Aberdeen exchange in the rate base and that there should be an opportunity to make a supplemental finding. We do not infer that the inclusion of this item must result in a different determination with respect to the adequacy of existing rates.

 Income and Expenses. The Commisson computed the net earnings from intrastate operations for the year 1957. It made certain adjustments as we have already indicated. The Commission rejected a proposed adjustment of casualty expenses. The Company contended that this item for 1957 was abnormally low and should have been adjusted to the level that may be expected in the future. The Commission's order denying a rehearing contains this statement: "Casualty expense (repairs due to storm damage) is a Maintenance expense item and, so far as we know, it is not required to be set apart in any separate account by the Classification of Accounts. Like the many other items making up the maintenance account, it can be expected to vary considerably from year to year but it does not appear to have any appreciable effect on the total maintenance expense when treated as a whole. This is demonstrated by the fact that in the year 1950, when casualty expense is claimed by Applicant to be a maximum for the 10-year period used, maintenance expense amounted to $20.11 per station while in 1957, when casualty expense is claimed to be at a minimum, maintenance expense amounted to $21.79 per station." The Commission was not required to give conclusive weight to the showing presented by the Company. The disallowance was based on substantial evidence and we cannot disturb it.

The effect of the replacement at Aberdeen was to decrease expenses annually by an estimated $8,598, which would increase earnings by that amount. An adjustment upward in net earnings would result from an inclusion of such replacement in the rate base.

 Rate of Return. The Company takes no issue with the Commission's conclusion that 5.8 per cent is a reasonable rate of return. However, it contends that it is entitled to charge rates that will actually yield such return on its property at the time the property is being used for

the public service and for a reasonable time in the immediate future. It asserts that if a rate of return applied to operating results for a past period is not representative of the future, the Commission is required to follow a procedure that will permit the Company actually to earn the rate of return allowed.

A public utility admittedly is entitled to charge such rates as will permit it to earn a reasonable rate of return on the value of the property devoted to public service. Application of Northwestern Bell Tel. Co., 69 S.D. 36, 6 N.W.2d 165; In re Northwestern Bell Telephone Co., 73 S.D. 370, 43 N.W.2d 553. In Bluefield Water Works & Improvement Co. v. Public Service Commission, 262 U.S. 679, 43 S.Ct. 675, 679, 67 L.Ed. 1176, the Court said: "The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally."

In Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 288, 88 L.Ed. 333, the court stated the rule as follows: "The rate-making process under the Act, i. e., the fixing of 'just and reasonable' rates, involves a balancing of the investor and the consumer interests. * * * But such considerations aside, the investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. * * * By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity

of the enterprise, so as to maintain its credit and to attract capital." See also Southwestern Bell Telephone Co. v. Public Service Commission, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981; Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206; New England Tel. & Tel. Co. v. Department of Public Utilities, 327 Mass. 81, 97 N.E.2d 509.

The Company contends that the treatment of its construction program by the Commission has the effect of confiscation and is an attempt to dictate policy; that a substantial portion of the plant being added in the immediate future is for the purpose of replacing existing plant and will produce no additional revenue; and that as plant at high construction cost is added the increase in rate base is greater than that of earnings and the allowed rate of return cannot be earned.

It is repeatedly stated or implied in the decided cases that a regulatory agency has no power to dictate policy for a utility unless a situation developes which is inimical to the public interest. Southwestern Bell Telephone Co. v. Public Service Commission, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed 981. Elyria Telephone Co. v. Public Utilities Commission, 158 Ohio St. 441, 110 N.E.2d 59. The Commission in its decision disclaims authority to substitute its judgment with respect to the extent of the Company's construction program for that of management having the responsibility for the rendition of service to the public. The Commission acting upon certain figures in evidence of additions and level of earnings for the years 1954 to 1956 concluded that continued normal growth in revenues under present rates will be sufficient to enable the Company to add to its plant as necessity may reasonably require. In the exhibit introduced by the Company based on estimated book cost of plant plus materials and working capital as of December 31, 1958, there was included valuations based upon estimated costs of planned construction for that year. The Company also introduced in evidence a statement of estimated net income for 1958. Determination of the need of improvements and additions is, of course, the problem of manage-

.ment and construction can be performed or not in accordance with its business judgment. It is questionable, however, whether management can engage in an expansion program and thus add costs to the rate base on which a reasonable return is to be earned without regard to the interest of present consumers. See State Corporation Commission v. Mountain States Tel. & Tel. Co., 58 N.M. 260, 270 P.2d 685. We need not, however, consider the responsibilities of management in this regard. The Commission has anticipated reasonable future extensions in the light of past experience and their probable effect on the rate of return. We cannot say that the Commission was bound to accept predictions of the Company as to future earnings and the value of its plant on a date several months after the taking of testimony. If the level of return is not actually maintained and inequities result, the Company may make application for change of rates.

 Interstate Operations. The Company complains of the considerations of interstate operations by the Commission. The parties agree that a separation must be made on the basis of relative use of the facilities of the Company for intrastate and interstate services. The Commission had before it tabulations and calculations based on the methods of separation specified in the Separations Manual to which we have referred. These tabulations and calculations for the most part were contained in exhibits introduced in evidence by the Company. It is not claimed that property devoted to interstate operations was improperly included in the rate base or that revenues and expenses were not allocated according to the methods prescribed by the manual. The Commission having arrived at a reasonable and just separation of property, revenues and expenses and calculated its return upon the intrastate base, we think that the complaint of the Company regarding interstate operations is without merit.

Conclusion. We have indicated that the Commission should have included in the rate base the cost of replacement at the Aberdeen exchange. This Court, of course, has not attempted to determine whether such adjustment calls

for an increase in rates. It is beyond the power of this court to fix rates. The cause is therefore reversed and remanded to the trial court with instructions to remand to the Commission for further action consistent with this opinion.

SEACAT, Circuit Judge, sitting for SMITH, J., disqualified.

All the Judges concur.